**Olen Ward MURFF, et al., Plaintiffs**

v.

**UNITED STATES of America, Defendant,**

**National Aviation Underwriters, Inc. and National General Insurance Company, Intervenors.**

**Civ. A. No. B–83–54–CA.**

United States District Court, E.D. Texas, Beaumont Division.

Nov. 29, 1984.

Kenneth D. McConnico, McConnico, Pegues & Slaughter, Houston, Tex., John A. Betts, Fleming, Betts & Cooke, Houston, Tex., for plaintiffs.

James P. Piper, James S. Dillman, Sr. Aviation Counsel, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Ruth Harris, Asst. U.S. Atty., Beaumont, Tex., for defendant.

Charles H. Smith, John R. Browning, Shank, Irwin & Conant, Dallas, Tex., for intervenors.

### MEMORANDUM OPINION

JOE J. FISHER, District Judge.

This Federal Tort Claims Action arises from a tragic mid-air collision on August 6, 1980. A Cessna 172 occupied by the plain-

tiffs' decedents collided with a Fairchild F–27 at 6600 feet near Bridgeport on the northwest fringe of the Dallas-Fort Worth air traffic control area. Although damaged by the collision, the F–27 airliner landed safely nearby without injury to its occupants. Absent its left wing the Cessna plunged to earth. Flight instructor John L. Fitzgerald, and his student, Dan A. Murff, did not survive the crash.

The survivors of the two men sued the United States of America under the Federal Tort Claims Act, 28 U.S.C. 2671, *et seq.*, alleging that the negligence of air traffic controllers caused the crash and deaths. The case was tried to the Court.

Messrs. Murff and Fitzgerald were on an instrument training flight in weather offering 15 miles visibility with scattered cloud cover. Murff, 19, already licensed as a pilot of some fixed wing and rotorwing aircraft, was near completion of training for an instrument rating under the tutelage of Fitzgerald. Fitzgerald, 37, an experienced pilot and instructor, had flown light airliners and was soon to begin work as a pilot for the Government. Messrs. Murff and Fitzgerald began their last flight from Meacham Field in Fort Worth around 11:00 a.m. (1700 hr. G.M.T.) under visual flight rules (VFR) with notice from an air traffic control center that the radar signal from the Cessna's transponder was "weak," but apparently discernible. A combination of oversights and omissions by both men, as well as the defendant, brought an untimely end to the flight and the men's lives.

Murff and Fitzgerald neglected to file a flight plan and did not request flight following or radar service from air traffic control once airborne. Apparently, they did not take the precaution of burning the Cessna's landing light as encouraged by the FAA's "lights on program." Supposedly, because of the temperature, Fitzgerald decided to fly above the 5000 foot ceiling recommended by his employer, Acme School of Aviation. Fitzgerald also apparently directed Murff to maneuver near the Bridgeport VOR Station, a frequent intersection point for instrument flight rules (IFR) traffic. Finally, while it is uncertain whether the pilots failed to monitor the radio channel used by IFR traffic in the vicinity, they at least failed to notify the controllers of their location and intentions.

The F–27, a twin engined turbo-prop plane, left Rapid City, South Dakota with 17 people aboard for a direct flight to Dallas' Love Field. Approaching the Bridgeport VOR, the F–27 reported at 1720:55 its location and altitude of 19,000 feet. The pilot apparently turned east and was told at 1725:12 to descend to 10,000 feet. Six minutes later, at 1731:49, air traffic control instructed the F–27 to go 10 miles east of Bridgeport at and maintain 6,000 feet. Throughout its flight and until the collision, the F–27 crew was flying a course and altitude approved, if not entirely prescribed, by FAA controllers.

At 1735:48, still descending and flying at c. 200kts., the F–27 crew received it's only warning of nearby traffic:

Fairchild seven whiskey alpha: VFR traffic at one o'clock. Ah, four miles, southeast bound, slow moving, altitude unknown.

Responding to the traffic advisory, an F–27 crewman answered:

Ah, whiskey alpha; lookin[g] ah, no joy (sic).

We're above a cloud deck here.

"No joy," although not "approved phraseology," is airman slang for no contact or no sighting. The controllers understood the F–27's message. He was looking for the plane at one o'clock, but did not see it. Perhaps it was below the clouds to which the Fairchild was descending. The planes, although approaching one another, did not then appear to be on collision courses.

At about this time, the Court finds, the 172 was maneuvering somewhere in the vicinity of the Bridgeport VOR under visual flight rules (VFR). The altitude of the Cessna, like its precise location in the minutes before the collision, is unknown. Presumably, student Murff was wearing a "hood" which restricted his vision to the instruments. However, Murff's instructor, Fitzgerald, should have been on the lookout

for other planes while Murff was under the hood, flying by the instruments.

The radar target detected by the controller and reported to the F–27 was not enhanced by a transponder signal, indicating the plane was flying VFR and had no working transponder turned on. Had it been an IFR target, the controller would have known at least the plane's reported altitude and speed and could have inquired as to its course. The same would have been true had its crew merely contacted the controller and so advised him. Such was not the case.

It appears that the Cessna pilot changed course shortly after the traffic advisory. Perhaps he was already turning when the controller called the F–27. In any event, the Cessna ultimately was on a converging course 143 degrees from the F–27's heading. The planes' closing speed was approximately 500 feet per second, or about 285 kts.

During the time between the traffic advisory at 1735:48 and the report of the collision at 1737:14, the traffic in the controllers' sector was light. Controller Williams observed no other VFR traffic near the F–27 in the minutes preceding the collision. The transcript of the controller's radio transmissions shows he was working only three IFR planes in his sector. No radar malfunction was reported that day. Although Williams and his co-worker, Harrell, had other duties besides monitoring the radar screen, such as reviewing flight "strips" as to incoming IFR traffic and time monitoring, these tasks were neither pressing nor of higher priority. While they had the ability to monitor the radar screen in the time preceding the crash—during which the radar displayed six "updates"— the controllers did not apprehend the convergence of the two aircraft.

At 1737:14, the F–27 told the controller about the collision:

Ah, center: Fairchild 707 whiskey alpha. We've just had a mid-air.

The Cessna and the F–27 collided, damaging the latter's stabilizer and the left wing and wing strut of the former. Fortunately,

the airliner's crew made a safe emergency landing nearby. The Cessna crashed and Messrs. Murff and Fitzgerald were killed.

Apparently, the Fairchild crew never saw the Cessna, and obviously the decedents did not see the F–27 in time to avoid it. Both planes were painted white and likely both had clouds behind. Moreover, even a diligent scanning by the pilots might not have detected the others' plane in time to avoid it. The court heard testimony, for example, that the customary scanning of the horizon by a pilot—observing the sky from one side of the windshield to the other—can take as long as 15 seconds. At their estimated closure speed of 500 feet per second, the planes could move 1.25 miles closer between observations through a particular 10 degree arc of the windshield. Given the pilots' failure, perhaps inability, to see and avoid the other's plane, the radar screen of the FAA offered the only remaining means of perceiving the impending collision and of preventing it.

■ The United States may be liable under the Federal Tort Claims Act for negligently providing services upon which the public relies. The duty of the government to advise and assist pilots rests both upon the regulations of the FAA and the general reliance of pilots on the government for a given service. *Gill v. United States,* 429 F.2d 1072 (5th Cir.1970); citing *Hartz v. United States,* 387 F.2d 870 (5th Cir.1968). Here, the pilots relied on the government— as all pilots must—to provide safety advisories and directions to avoid collisions.

The plaintiffs insist, and the Court agrees, that in the circumstances of this case, the FAA controllers had a duty to warn about a possible collision and to act to prevent it. That duty is inherent to the mission of air traffic control: "to provide for the safe, orderly, and expeditious flow of air traffic." See 14 C.F.R. 65.45(a). FAA manuals further emphasize that controllers should be "intimately and continuously concerned with safety and the protection of life and property." Moreover, controllers are specifically advised to "continu-

ally issue instructions to pilots on what headings to follow to maintain separation, what altitudes to fly to remain clear of traffic..."

The general duty of the FAA is modified, however, by specific directives which set priorities as to different types of air traffic. The primary concern of the FAA is the direction of the IFR traffic, consisting mostly of commercial airline flights. Workload permitting, controllers advise and otherwise assist VFR traffic. One might say the FAA has a "higher" duty to IFR than to VFR pilots, but that is not correct. Rather, the FAA has an "earlier" duty thereto. But once a controller has directed his IFR pilots, his duty to VFR pilots arises—and rises to the same level of care for the "safety and protection of life and property" of VFR as of IFR pilots. In particular, those duties include issuing traffic advisories to converging aircraft and vectoring aircraft to maintain safe separation between them.

■ In the context of this case, the two FAA controllers directing the crash sector clearly had a duty to protect the F–27's occupants. And if their workload permitted, the controllers were duty bound to protect the plaintiffs' decedents. The evidence is uncontroverted that the controllers' workload was light at that time. Only three IFR planes were in their sector and radio transmissions were few. Moreover, radar showed no other traffic near the converging aircraft. The court finds that the flight activity in the sector in the critical minutes preceding the crash was sparse. Inasmuch as not one, but two controllers were working the crash sector then, there can be no doubt that they had the time and ability to protect the crew of the Cessna.

The radar did not malfunction that afternoon, and the two controllers, both seated closely to the screen, could see the two targets coming together. The planes' increasing proximity caused controller Williams to warn the Fairchild when the aircraft were about four miles apart, but he and his co-worker, Harrell, apparently failed to look again at the screen in the next minute and a half. In that interval, the radar displayed six new views of the aircrafts' relative positions. In addition, the controllers had the ability to display the past four "hits" on the screen and therefore see the Cessna's course change. Neither man observed the continuing convergence of the aircraft. Neither tried to contact the VFR target by radio so as to ascertain its altitude and heading. And, as a result, neither controller warned of the impending disaster. Only after the report of the "mid-air" did Williams offer a vector to the Fairchild. Had he done so earlier, the crash would not have occurred.

Asked what the controllers were doing in the crucial interval, Williams replied, "Other control functions associated with the Bridgeport radar positions." No radio calls distracted the controllers during the interval and neither could remember any other events which prevented them from watching and warning the pilots. "Other control functions," the court finds, were merely lower priority tasks.

The court finds that no higher priority tasks required the controllers' attention then, and they therefore owed a duty to Murff and Fitzgerald as well as the occupants of the Fairchild. That duty was to exercise reasonable care in advising and directing the pilots to prevent the loss of life and property. Under these circumstances and considering the light radar and radio traffic at the time, the two controllers failed to act in a reasonable manner. Their failure to watch, to warn, and to maintain "separation" of the aircraft was negligence, for which the Defendant is liable. Indeed, had they simply told the Fairchild to briefly alter course, the tragedy would have been averted.

■ To say the controllers caused the collision seems, at first glance, to go too far. True, they ordered the F–27 to fly that heading. But the Cessna moved beyond their control, apparently incommunicado, and it turned unwittingly into the path of the F–27. But because the pilots could not see the others' plane, the control-

lers were the only people who, during the final eighty seconds, had available the knowledge, the means, and the power to prevent the crash.

The government insisted that the pilots alone were at fault in failing to "see and avoid" each other. Such a rule, so broadly applied, subsumes all collisions. Obviously the pilots failed to see and avoid; their planes collided. Was it possible for them to see the others' plane in time to avoid? The court finds it was not. The evidence indicates that the F–27 was descending toward a cloud deck and would not have been visible to the 172 until after it emerged from the clouds. Moreover, there were likely clouds below the Cessna, as well. Both planes were white and would be hard to see with clouds behind them. The Cessna may have been as little as 500 feet below the cloud from which the Fairchild emerged. Moreover, the 172 was turning to the left when it struck the F–27. With his left wing down, the pilot of the 172 had an obstructed view. And the planes' closing speed of 500 feet per second gave the pilots precious little time to react. The court finds, therefore, that the negligence of the controllers was a proximate cause of the crash.

The victims themselves, however, were not without fault. As noted above, both were experienced pilots, presumably familiar with safety procedures. Both men failed to exercise reasonable care by advising controllers of their location and intentions, by not requesting flight following or radar service, and by not burning the landing light. Fitzgerald, as the instructor, had an additional responsibility to Murff who, necessarily, was relying on Fitzgerald to keep a lookout while Murff wore the hood. Moreover, Fitzgerald was further negligent in choosing to fly at the collision altitude while near the Bridgeport radial. He further erred in continuing the flight after he learned of the 172's weak transponder signal.

For the above reasons, the Court finds JOHN LEE FITZGERALD, deceased, and DAN ALLAN MURFF, deceased, to be contributorily negligent and their comparative fault to be fifteen (15%) percent, respectively, for a total of thirty (30%) percent, and the comparative fault of the controllers to be seventy (70%) percent.

■ When the unfortunate accident occurred, Mr. Fitzgerald was thirty-seven (37) years old, in good health, with a work life expectancy of some twenty-two (22) years. He was an experienced commercial pilot and instructor and he had a large earning potential. He is survived by a widow and young daughter, both of whom suffered severe mental anguish due to their husband and father's death. They also lost the love, affection and companionship of their husband and father, which loss affects them for years to come. Finally, the Court finds that Mr. Fitzgerald endured considerable mental suffering from the time of the collision until he finally met his death. The aggregate damage with respect to Mr. Fitzgerald, considering the reasonable amount of money which he would have spent on his own maintenance, and discounting to present value all future damages as required by *Culver v. Slater Boat,* 722 F.2d 114 (5th Cir.1983), and deducting said amount thirty (30%) percent of the comparative fault attributable to the deceased and seventy (70%) percent of the comparative fault attributable to the Defendant, the Court finds the total damages to be Seven Hundred Fifty Thousand ($750,000.00) Dollars.

■ DAN ALLAN MURFF was nineteen (19) years of age at the time of his death and was a single man. However, he was a valuable producer on the family farm and was a vital family member from an emotional standpoint. Mr. Murff had a work life expectancy of some thirty-eight (38) years when he died, and he had a promising income potential. Already licensed as a helicopter pilot, he worked as a pilot part-time and also worked regularly on the family rice farm. The Court finds that Mr. Murff would have continued to

work in the family enterprise in the future, and would continue to provide economic support to the family as he grew older. Because of his closeness to his family, the Court finds his parents suffered severe mental anguish upon his death and are further deprived of Mr. Murff's future love, affection, and support. Like Mr. Fitzgerald, he suffered severe mental anguish while falling to his death. The aggregate damage with respect to Mr. Murff, considering the reasonable amount of money which he would have spent on his own maintenance, and discounting to present value all future damages as required by *Culver v. Slater Boat,* 722 F.2d 114 (5th Cir.1983), and deducting said amount thirty (30%) percent of the comparative fault attributable to the deceased and seventy (70%) percent of the comparative fault attributable to the Defendant, the Court finds the total damages to be Seven Hundred Thousand ($700,000.00) Dollars.

Accordingly, judgment will be entered in favor of the Fitzgerald plaintiffs and against the Defendant in the amount of Seven Hundred Fifty Thousand ($750,-000.00) Dollars, and judgment will be entered in favor of the Murff Plaintiffs and against the Defendant in the amount of Seven Hundred Thousand ($700,000.00) Dollars.

However, the parties have stipulated that the intervenors, NATIONAL AVIATION UNDERWRITERS, INC. and NATIONAL GENERAL INSURANCE COMPANY, have a worker's compensation lien on damages awarded to the Fitzgerald plaintiffs in the amount of Seventeen Thousand Eight Hundred Seventy-four and 89/100 ($17,874.89) Dollars as of August 15, 1984. Any additional amounts of worker's compensation payments paid will be added to this amount and will be deducted from the total amount of damages awarded to the Fitzgerald plaintiffs and paid directly to the Intervenors, NATIONAL AVIATION UNDERWRITERS, INC. and NATIONAL GENERAL INSURANCE COMPANY.