**Louise GADDIS, Personal Representative of the Estate of John C. Gaddis, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Lawrence PEPPER, Personal Representative of the Estate of Chris J. Fiala, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Florence HEATH and Thomas B. Wells, Co-Personal Representatives of the Estate of Frederick R. Heath, Deceased, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. Nos. 82–71829, 82–73429 and 82–73469.

United States District Court, E.D. Michigan, S.D.

July 26, 1985.

Victoria Heldman, Detroit, Mich., for Gaddis.

Charles J. Barr, Detroit, Mich., for Pepper.

Thomas B. Wells, Detroit, Mich., for Heath.

Dennis Carroll, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., for defendant.

## OPINION

RALPH B. GUY, Jr., District Judge.

This case involves a mid-air collision which occurred approximately three to four miles from Oakland-Pontiac Airport (hereinafter referred to as Pontiac) on October 14, 1980, in which three persons died. There were two aircraft involved. The first was a Cessna 337–H, a "Skymaster," registration number N1333L (hereinafter referred to as 33L), which had departed from Parkersburg, West Virginia, and which was to land at Pontiac to pick up a passenger and return to Parkersburg. The pilot and sole occupant of that aircraft was Chris J. Fiala. Fiala was a professional pilot and regularly flew small aircraft, including a Cessna 337, on various cross-country flights. The second aircraft was a Cessna 182K, a "Skylane," registration number N2555R (hereinafter referred to as 55R), which had departed from Pontiac en-

route to the Detroit City Airport. The occupants of 55R were Frederick Heath and John Gaddis. Heath was a professional pilot who was giving instructions to Gaddis in order for Gaddis to obtain his instrument rating. Gaddis was also an experienced pilot. It is not certain whether it was Heath or Gaddis in the pilot's seat or who was actually flying 55R at the time of impact. There is no evidence that Gaddis was wearing a "hood" used in instrument training. All pilots were properly certified and qualified for the flight in question. No aircraft malfunction caused or contributed to the collision.

The other individuals involved in this case were air traffic controllers employed by defendant's agency, the Federal Aviation Administration (FAA). Glenn Page was the local controller in the Pontiac tower. The tower has no radar. Aloysius Klein was the radar controller at Detroit Metropolitan Airport Terminal Radar Approach Control (TRACON) for the Pontiac West position (PTKW). Patrick Spencer was the radio controller at TRACON for the Pontiac East position (PTKE). Klein and Spencer were working at the same radar screen. All three controllers were properly certified for their positions. All three controllers lost their employment with the FAA as a result of the PATCO strike.

Reported weather at Oakland-Pontiac Airport the day of the accident was ceiling 3,000 feet broken; 8,000 foot overcast; wind 080 degrees at 10 knots; visibility 6 miles, with fog and haze; temperature 41 degrees Fahrenheit; dewpoint 39 degrees Fahrenheit.

In the National Transportation Safety Board (NTSB) factual report, the investigator, E.J. McAvoy, reported that the collision was witnessed by numerous persons in the area and that the general *concensus* of their observations was that 55R was heading southeasterly and was in a climb at the time of the impact, 33L was heading northwesterly and was descending, both aircraft were in an evasive bank to the right, and the left wing of each aircraft contacted each other.

33L departed from Parkersburg under an Instrument Flight Rules flight plan (IFR), which meant it was under radar control during its flight. At 12:36 P.M., 33L contacted TRACON. At 12:43 PM, the aircraft was "handed off" to the Pontiac East sector approach at TRACON, manned by Spencer, at which time Spencer gave Fiala the choice of a visual or Instrument Landing System (ILS) approach to runway 9R at Pontiac. Fiala requested a visual approach. At some point, Spencer handed off 33L to Klein. When 33L was seven miles out from the airport, Fiala reported the airport in sight. Klein then contacted Pontiac tower. He requested a visual approach to runway 9R and was given approval by Page. He then told 33L it was cleared for the visual approach and that it was to make contact with Pontiac tower. 33L made contact with the tower and was immediately informed by the tower: "Three Three Lima watch for a Cessna one mile Southeast of Pontiac. Southeast bound towards city." Such a warning is a traffic advisory. Fiala, in 33L, replied: "Three Three Lima, I'll be looking."

Meanwhile, at 12:49 PM, the pilots in 55R advised Pontiac tower that they were ready to taxi for a Visual Flight Rules (VFR) flight to Detroit City Airport. The tower cleared the aircraft for taxi to runway 9R. At 12:53, 55R advised Pontiac tower that they were ready for takeoff, and the tower cleared 55R for takeoff "right turn approved." At 12:55:51, after having advised 33L to watch for a Cessna southeast bound towards city, Pontiac tower transmitted the traffic advisory: "Five five Romeo, traffic is a Skymaster inbound on the visual Southeast." There was no acknowledgement from 55R. At 12:56:14, 55R contacted the tower and requested a frequency change, which the tower approved. That was the last contact any controller had with either of the two aircraft before their mid-air collision.

It is plaintiffs' contention that defendant, through its FAA air traffic controllers at Pontiac and Detroit Metropolitan Airports, was negligent in handling the two aircraft. They also claim that defendant was negli-

gent in the design and execution of procedures for the handling of IFR arrivals on visual approach to Pontiac.

Defendant contends that the sole cause of the accident was the negligence of the three pilots, who failed to see and avoid each other as they should have. Defendant denies that its controllers were negligent in any way, or that its procedures contributed to the accident.

The parties agree that the major issues before the court are whether the controllers acted as reasonable air traffic controllers and whether the procedures in use were reasonable.

The court will deal with the parties' arguments chronologically, turning first to the actions taken at Detroit Metro TRACON. The first issue involves plaintiffs' claim that Klein should have followed the progress of 33L on the radar screen after clearing 33L for a visual approach. The court finds that no rule requires a controller to follow on the radar screen an aircraft he has handed off to a tower. Paragraph 796 of the Air Traffic Control Manual (Plaintiffs' Exhibit No. 7) within Chapter 4 "Radar Operations," concerns "Visual Approaches," and is the paragraph to be applied to Klein. 33L had requested a visual approach. Paragraph 796 directs a radar controller, after clearance for a visual approach, to:

> d. Continue radar monitoring and traffic information until the aircraft is instructed to contact the tower, the FSS, or on pilot request UNICOM or airline company radio when the destination airport is not tower controlled.

In this case, 33L was instructed to contact Pontiac tower and had done so. The Manual does not require further radar monitoring, and plaintiffs' experts, Donald Sommer and Frank McDermott, both admitted in their testimony at trial that there is no obligation to continue radar monitoring. The court further finds that such a procedure is the reasonable one, given the circumstances under which radar controllers operate. They have a number of aircraft and other "blips" on the radar screen, and it would be impossible for a controller to continue to follow each aircraft he had handled when he was no longer the one giving directions to the pilot of the aircraft.

Klein testified that controllers do not ignore a dangerous situation which they happen to see on the screen, and that certainly they should be responsible for trying to do something about such a dangerous situation if they observe it. However, Klein's testimony is that he did not notice any problem with 33L on the screen after 33L made contact with Pontiac tower. That testimony was not rebutted, and, indeed, McDermott testified that there is no evidence that Klein ever saw a target on the radar screen representing 55R and that he is sure that Klein was never aware of 55R.

The court would note here that it finds the testimony of both Mr. Klein and Mr. Page very credible. Both men were dismissed from their jobs as a result of the PATCO strike. They were not in-house government witnesses, nor were they at risk themselves in this litigation.

A second issue raised by plaintiffs the court finds a non-issue. That is the contention that Spencer, at TRACON PTKE, turned over 33L to Klein, at TRACON PTKW, too soon. First, Klein testified that turning over an aircraft early is not an infrequent occurrence, and that it was customary for PTKW to take control of an aircraft before it entered the West sector. The court finds such a procedure reasonable, given the work conditions of the controllers. More important, however, plaintiffs have completely failed to show that anything adverse flowed from this occurrence. Plaintiffs have not shown that handing over 33L early from Spencer to Klein caused anything to happen differently than it would have otherwise or had anything to do with the accident. The only comment from plaintiffs on this issue was McDermott's response that he doesn't know what Spencer might have done differently.

The court also finds no significance to Klein having allowed another aircraft, Skyline 26H, to travel farther north than it had planned. The plane was on a training

flight, and Klein testified that he has many times given training flights more latitude so long as they do not go beyond an area with which he feels comfortable. This incident is no evidence of carelessness or a lack of attention on the controller's part.

The major issue involving the actions of the TRACON controllers is Klein's clearance of 33L for a visual approach. It is undisputed that Klein knew nothing of 55R. Plaintiffs neglected to ask Klein what the court views as the key question relating to this issue: "If you had been told that 55R was departing southeast bound would you have done anything differently?"

However, before the question is even reached, plaintiffs must first have established that Page was negligent in not reporting to Klein that 55R was taking off. Pertinent to this issue is the parties' disagreement over the interpretation of Chapter 3, "IFR Operations," Paragraph 430, "Visual Approach," of the Air Traffic Control Manual, which reads as follows:

430. VISUAL APPROACH

ARTCC sectors, approach control positions of operation, and when authorized by a Letter of Agreement (at collocated facilities—a Facility Directive) with the facility providing IFR service, VFR towers may clear aircraft for a visual approach if the following conditions exist:

a. Potential conflicts with all other aircraft have been resolved.

b. Weather conditions at the airport are reported VFR, or at airports with no weather reporting service, the pilot reports that descent and flight to the airport can be made in VFR conditions.

c. The pilot has reported sighting the airport.

d. The aircraft is number one in the approach sequence or has reported the preceding aircraft in sight and is instructed to follow it.

Plaintiffs argue that Page, at the VFR tower, was the controller who had to clear 33L for a visual approach. They contend that he should not have done so as, while conditions (b), (c), and (d) had been met, condition (a) had not been. Plaintiffs assert that 55R was a "potential conflict" about which Page knew. In response, defendant asserts that Pontiac tower was not authorized by a Letter of Agreement to clear aircraft for a visual approach. Defendant points to the language in the Detroit Metro/Pontiac Tower Letter of Agreement (Plaintiffs' Exhibit No. 5) which sets forth Pontiac tower's duties, including the responsibility to "approve or disapprove requests for visual or contact approaches." (Letter at 2.) Defendant contends that, pursuant to the Letter and Paragraph 430, Pontiac tower could only "approve" a visual approach after a request from the approach control position, which then had the responsibility to "clear" the aircraft for a visual approach.

The court finds "clear" and "approve" to be technical terms of art, with different meanings. Pontiac tower was not authorized by the Letter of Agreement to "clear" aircraft for a visual approach, and, while Page was required to "approve" or "disapprove" a visual approach for 33L, that approval was prior to Klein's clearance. Since Klein did not know of 55R as a "potential conflict," he could not be negligent for clearing 33L for a visual approach. The question then is whether Page was negligent in approving a visual approach for 33L without reporting to Klein that just two minutes previously he had cleared 55R for takeoff.

First, Page's testimony that he never saw 33L is unrebutted. 33L was still several miles from the airport when the accident occurred. Page had only a general knowledge of where 33L was since he did not have radar. He did not have 33L's precise heading or its o'clock position. Further, according to all testimony, once 33L was cleared for a visual approach, it was free to change its direction and altitude, so Page could not know its exact location. Page acknowledged that he did not tell Klein about 55R and even agreed that the two aircraft were in "potential conflict." However, Page defines potential conflict as analogous to vehicles approaching each other on a highway at any time. He never felt that 33L was in unsafe prox-

imity to 55R. The court finds nothing in the record to indicate that Page actually suspected or should have suspected a problem of unsafe proximity between 33L and 55R.

Second, no one disagrees as to the accident having occurred under good VFR flying conditions. Given such conditions, the court finds that it was reasonable to have relied on the pilots to provide their own visual separation. Whether or not it was the controllers' primary duty, it was agreed by all witnesses that separation of aircraft was one of their major duties. However, the court finds that the only reasonable way controllers can perform all their duties and for the air traffic control system to run at all efficiently is for controllers to rely on pilots to maintain vigilance and "see and avoid" each other under these circumstances.

Sommer testified that, according to the Airman's Information Manual (Defendant's Exhibit No. 18), a pilot is not to expect traffic advisories on all traffic. Here, the parties were given advisories. Sommer acknowledged that the Manual describes how to scan for other aircraft, and that he would expect pilots, including his students, to know this information. He further agreed that the FAA Regulations require pilots to be knowledgeable of FAA Advisory Circulars, and said he took no exception to the September 5, 1980, Advisory Circular (Defendant's Exhibit No. 20). That Advisory Circular describes the "see and avoid" concept, and requires vigilance when weather conditions permit regardless of whether the plan is IFR or VFR. It also describes visual scanning and clearing procedures.

Plaintiffs presented Stanley Roscoe as an expert on visibility from aircraft. Roscoe testified that it would have been difficult for 55R to have seen 33L due to 55R's high "pitch" angle while ascending, and that it would have been difficult for 33L to see 55R, mainly due to the effect of "clutter"— the background of trees, houses, etc., while descending. He testified that if two aircraft are on a collision course, the pilots cannot detect vertical movement, and the effect is that they very seldom detect the

collision course until the last minute, unless given directions on where to look.

Here, the pilots *were* given directions. When 33L contacted the tower, it was issued a traffic advisory and, immediately thereafter, the tower issued a traffic advisory to 55R. Page gave each pilot as much information as he knew, given the fact that 55R was flying VFR and that 33L was to be on a visual approach.

Page followed the usual procedures in acting as he did, and the court, as indicated above, finds those procedures reasonable. Plaintiffs' experts proposed a number of different procedures which they claim could have been used. Sommer testified as to the problems with the "see and avoid" concept. He contends that even when a pilot is given the o'clock position, direction, and altitude of the other craft, he is likely to sight the other craft less than 30 percent of the time. If he is not given the o'clock position, direction, and altitude, the percentage is still lower. The problem is that, when the relative speeds are very high, by the time the pilots see each other, it is too late to take evasive action. Sommer's opinion is that is what happened in this case. Sommer further testified that the solution for dealing with conflicting VFR traffic is for the tower to inform the pilots of the problem or to direct one plane in another direction. Here, the pilots *were* informed of the potential problem. Plaintiffs argue that the better alternative would have been to have directed one of the aircraft to take a turn. However, the court finds that, while that may be a valid procedure when dealing with two craft whose positions are known to the tower, here Page could not have known where to direct the planes. A turn by one might have brought them into the very unsafe proximity everyone was attempting to avoid. In order for controllers to know every aircraft's o'clock position, direction, and altitude, no one could fly VFR or a visual approach on IFR. All pilots would have to fly IFR and be continuously monitored by radar.

As discussed above, plaintiffs' vision expert, Mr. Roscoe, testified that if two air-

craft are on a collision course they will very seldom detect each other until the last minute unless given specific directions on where to look. He testified that the "see and avoid" rule is a good one in that the system should take advantage of every recourse, but that the bad part of it is that it invites release from IFR to visual in situations in which the controller cannot be sure of separation. Again, if the goal were for the *controllers* to be *sure* of separation, no one could be allowed to fly VFR or visual on IFR.

Defendant's expert, James Cikalo, testified that it is the pilots who are primarily responsible for separation and that, within the Airport Traffic Area (a five-mile radius around the tower), a controller is not completely responsible for separation, as the controller cannot see all the planes without radar. He stated that when a controller in the Pontiac tower approves a visual approach he has no way of determining whether all potential conflicts with VFR craft have been resolved. The controller does know if an aircraft just took off, but such a situation does not constitute a potential conflict. The controller does not know and cannot know the o'clock position, exact direction, and altitude of VFR aircraft and those on a visual approach.

Plaintiffs then argue that, even if the procedure followed was reasonable, Page did not follow that procedure and was negligent in not repeating his traffic advisory to 55R when he did not receive an acknowledgement of the first advisory. The court concludes that Page was justified in concluding that 55R had received the advisory. The court finds it more probable than not that 55R received the advisory.

It is undisputed that 55R was tuned to the proper frequency and that its radio was working before and after the advisory was issued, as it made contact with the tower both before and after. McDermott testified that there is no reason to believe 55R's radio was not working properly. Further, besides the advisory issued to 55R itself, 55R was tuned to the same frequency over which there was talk between the tower and 33L and certainly could have heard those conversations, further alerting 55R

to the situation. Sommer testified that a pilot generally does not have the time to keep track of others' transmissions, but he did not know of anything to prevent 55R from hearing the transmissions.

There were good reasons presented as to why there was no acknowledgement by 55R. First, the court credits those witnesses who testified that traffic advisories, unlike safety advisories, are commonly not acknowledged. Klein testified that it was not uncommon to receive no acknowledgement, and that the other times when 55R had acknowledged transmissions were control instances where the controller would expect the pilot to acknowledge. Page also testified that it was not unusual to receive no acknowledgement to a traffic advisory. Defendant's expert, Richard Taylor, testified that many times he has heard a traffic advisory and has not acknowledged it. James Cikalo's testimony that he does not know of any requirement to acknowledge a traffic advisory was unrebutted. Although McDermott claimed that there is such a requirement, he could not point to any specific language in any document. Second, the transcript of the transmissions between the tower and the several aircraft in the area shows that another transmission immediately intervened after the traffic advisory to 55R at the time 55R might have been expected to give any acknowledgement. There is only speculation that that transmission "cut off" the traffic advisory itself, and the court finds no evidence in support of this theory.

Furthermore, everyone who testified agrees that Page had no information calling for a safety advisory. Most important, he did not have both aircraft in sight. 55R could not even expect to receive a safety advisory at that point in time since the pilots knew, as indicated by their request for a frequency change, that the tower did not know 55R's precise location. A traffic advisory, unlike a safety advisory, is not a top priority for controllers. The court finds no obligation on Page's part to repeat the traffic advisory.

What plaintiffs seem to be asking for as to every procedure criticized is the ultimate in safety. That goal is simply not achievable. According to the unrebutted testimony of Mr. Cikalo, Pontiac is the busiest VFR airport in the Great Lakes region. The court finds that fact the major explanation for the procedures which the tower controllers normally follow and which Page followed on the day of this accident. The tower controller simply does not have the time or the resources to notify TRACON of every plane taking off when TRACON calls for an approval of a visual approach. Cikalo also testified that Page could have told TRACON of 55R's departure, but that that is not standard procedure. The tower controller might have 10 to 12 planes waiting to take off. The airport cannot continue to operate if the controller must hold all those planes while another aircraft comes in on a visual approach. The testimony of defendant's expert, James Rowan, was unrebutted that a visual approach could never be approved if all other aircraft first had to be cleared. Further, since most of the aircraft are flying VFR and the craft coming in is on a visual approach, the controller cannot know which planes will come in proximity to each other. The other alternative would be to never allow a visual approach, but Roscoe admitted that at busy airports controllers must often release planes from IFR to visual approach in order to expedite the flow of traffic. Cikalo testified that the IFR system would be unworkable if all VFR targets had to be cleared for approval on a visual approach and stated that, on the average day, Pontiac tower approves 50 visual approaches. Common sense leads to the conclusion that, if all those planes had to come in on ILS, they simply could not be handled. Furthermore, it is to the pilot's advantage to come in on a visual approach. According to the testimony, a visual approach saves the pilot time and fuel.

Plaintiffs rely heavily upon the court's ruling in *Murff v. United States*, 598 F.Supp. 290 (E.D.Texas 1984). The court finds the factual circumstances of *Murff* quite different from those of the instant case. Most important is the fact that one of the planes involved in the collision in *Murff* was flying IFR and was not on a visual approach. As the *Murff* court pointed out, a controller has an "earlier" duty to IFR pilots than to VFR. The controllers in *Murff* had a duty to protect the IFR plane and, if their workload permitted, to protect the VFR aircraft involved. The controllers in *Murff* had radar and were monitoring the IFR craft. They were, in fact, directing the IFR craft in its flight path. That was not the situation in the present case. Pontiac tower did not even have radar, and plaintiffs have not argued that defendant was under any duty to have radar in the tower. TRACON had radar, but the testimony is unrebutted that Klein and Spencer had no continuing obligation to monitor 33L after it was handed off to the tower. Further, in *Murff* the radar controllers had on radar six new views of the aircrafts' relative positions, yet neither controller observed the VFR aircraft's course change. The court found that "[g]iven the pilots' failure, perhaps inability, to see and avoid the other's plane, the radar screen of the FAA offered the only remaining means of perceiving the impending collision and of preventing it." *Murff* at 293. Here, there was no such means. Klein had no duty to continue to monitor 33L and no duty to locate 55R on radar. His testimony is unrebutted that he never saw 55R on the screen. The *Murff* court concluded that the controllers were the only people who "had available the knowledge, the means, and the power to prevent the crash." *Murff* at 295. The controllers in this case did not have the knowledge, nor did they have the means and power. Since one plane was on VFR and the other on a visual approach, the controllers could not know where they were. The proposed solution in *Murff* of vectoring the IFR craft was not an option in this case where Page could not know the exact location of either aircraft.

There are a number of procedures which defendant *could* have adopted, but defendant is not required to adopt the ultimate in safety procedures, only reasonable procedures. The question before the court is

whether the controllers acted as reasonably prudent controllers following reasonably prudent procedures. As in all tort actions, a balancing test is involved—in this case, balancing safety with efficiency. On the highways, we have a 55 mile per hour speed limit and, in cities, we have open intersections. Safety could be improved by further lowering the speed limit and putting a stop sign on every corner. However, the rules in effect are the result of an appropriate societal balance. The court finds the procedures adopted by defendant and followed by controllers Page, Klein, and Spencer to also be the result of such a balance. As discussed above, the air traffic control system would simply be unworkable if each aircraft had to be monitored as plaintiffs suggest. If pilots want to continue to fly aircraft such as were involved in this collision, there must be VFR flights and visual approaches for IFR flights. On such flights, the primary responsibility for separation must be the pilots'.

Accordingly, the court will enter a judgment of no cause for action in favor of the defendant as to the mid-air collision on October 14, 1980.